THE STATE OF OHIO, APPELLEE, *v.* SMITH, APPELLANT. ▋

[Cite as State v. Smith (1976), 50 Ohio App. 2d 183.]

184

(No. 34857—Decided September 30, 1976.)

*Mr. John T. Corrigan*, prosecuting attorney, for appellee.

*Mr. Eugene Sidney Bayer*, for appellant.

JACKSON, C. J. On November 24, 1974, Learnas Smith was killed by a bullet fired from his own gun. His wife, Maggie Smith, the appellant herein, was taken into custody and held by the police for two days without being charged. After a writ of habeas corpus was filed in the Court of Common Pleas, appellant was charged with voluntary manslaughter. Subsequently, on December 18, 1974, she was indicted for murder in violation of R. C. 2903.02. The appellant entered a plea of not guilty and a trial was had before a jury.

The state's theory of the case was that the appellant and her husband had had an argument which led her to shoot him. The state was unable to offer any evidence, either direct or circumstantial, in support of its theory that an argument had taken place.¹ As to the question of appellant's

¹In his opening statement the prosecutor stated:
"I further anticipate the evidence will show that sometime in the course of the evening—in any event Mr. Smith had retired—but sometime in the course of the next half hour or time up to 10:30 they became involved in an argument, and that Mr. Smith was shot by Mrs. Smith."

guilt in the murder, the state offered evidence to show that the appellant had possession of the murder weapon after her husband's death and had carried that weapon to a neighbor's home; that though the appellant had made oral statements to the police and had shown investigating officers the locations of three other guns in the home, she failed to tell them about the murder weapon which she left at the neighbor's home; that she made a statement to one police officer stating that she had neither handled nor fired a gun that evening;[2] that in referring to the body of her husband, appellant asked Officer Kuhin, "Ain't you moved that mother-fucker yet?"[3]; and that the results of a test devised and administered by Sergeant Kovacic of the Scien-

---

Detective McKibben, who was in charge of the investigation of the case, testified on cross-examination as follows:

"Q. Did you ever determine that there had been an argument between Mr. and Mrs. Smith?

"A. No, sir.

"Q. You have no knoweldge of such an argument?

"A. No, sir.

"* * *

"A. I heard of no fight between the Smiths."

[2] Detective McKibben's testimony at page 375 of the transcript is as follows:

"I questioned Mrs. Smith as to handling or firing any weapons that evening, and she informed me that she did not handle weapons. She informed me that she did not pick up a weapon or fire a weapon that evening."

[3] Police Officer David Kuhin's testimony, in relevant part, was as follows:

"Q. Now, will you tell the Court and jury when you saw her [appellant] again?

"A. A few minutes after the arrival of her daughter she came out of the side door again while I was still standing with the body.

"Q. And was there anyone else in that immediate area around her?

"A. Not that I know of, not that I could see.

"* * *

"Q. Will you give us the exact words of this Defendant, Mrs. Smith, what she said to you, no matter what they were?

"Mr. Bayer: Objection.

"The Court: Overruled.

"The Witness: Well, her exact words were, 'Ain't you moved that mother-fucker yet?' "

tific Investigation Unit indicated that appellant had fired a weapon that evening.

The appellant took the stand in order to maintain her innocence and testified that she had not had an argument with her husband on the evening in question and that she did not shoot him. She also presented numerous witnesses, including neighbors, the son of appellant and the victim, the daughter of the victim and the stepdaughter of appellant, and that daughter's husband, all of whom testified that she enjoyed a good reputation for truth and veracity; that they had never known appellant and her husband to have any violent arguments; and that appellant and her husband had a good relationship.[4]

With respect to the murder weapon, appellant testified that she came downstairs from her bedroom after she had heard her husband arguing with another male and then heard shots fired; that she found her husband lying shot in the driveway;[5] that the murder weapon was also in the driveway; and that she had picked the weapon up and given it to her neighbor. It was not disputed that the appellant simply handed the gun to her neighbor and that she did not ask the neighbor to conceal the weapon or withhold it from

---

[4]For example, the daughter of the decedent and stepdaughter of the appellant characterized the marriage as a "beautiful relationship." The son-in-law testified that appellant and the decedent had "the type of life I would want to have with my wife one day. They had a beautiful life." State's witness Hughes, a neighbor, thought they were an "ideal family" and his wife, a defense witness, termed the marriage "lovely," and stated that she had "never heard them having an argument or fuss in the whole 20 years I have been there."

[5]Mrs. Smith:

"I said, that ain't nobody but some of the neighbors picking at him. The day he is off he had company, I figured it was somebody he knows come up on the kitchen steps. I heard the shot and I was too frightened. Afterwards I did get my dress on. I didn't know where to go in the front door of the shooting—I didn't know whether he was shooting or somebody was shooting at him, so at the time I did get my dress back on the side door slammed and then I had to go see about him.

"I walked to the kitchen, and then I called my husband, 'Boy, boy.' And I kept calling, then I seen the side door open, which I think it was open. I went out there. He was laying in the driveway."

the police.[5] Appellant testified that her act of picking up the gun from the driveway and her failure to volunteer information about that gun were the product of her extreme emotional distress caused by the death of her husband.[7] The appellant controverted the testimony of the one police officer who claimed that she stated to him that she had neither handled nor fired a gun that evening. She stated that not only had she not denied handling the weapon, but that the officer who testified had not even asked her any such question.[9]

---

[6]Mr. George Hughes, appellant's neighbor, was called as a state's witness. Relevant portions of his direct testimony were as follows:

"* * * Mrs. Smith came to the door and told me that something awful had happened."

"Mrs. Smith had this gun and she said 'Hold this.' Something to that effect. So I in turn laid the gun on the shelf at my side door * * *."

Mrs. Smith testified upon this same incident as follows:

"I told him, 'Here, take it. It was lying in the driveway. Too many people coming in here. I don't want the gun lying in the driveway.'"

[7]Mrs. Smith's direct examination:

"A. He said, he told me—I don't remember this, but he said I give him the gun when he come to the door, but the way I remember I didn't see the gun until I went over there and got it.

"I bent over him to see his pulse and rub his face and I seen the gun near the bumper of the car and that's the way I remember until I went back over there.

"I was so upset I don't remember."

Mrs. Smith's cross-examination:

"Q. I wish you could tell me why you didn't tell the police about this gun?

"A. I didn't think about it that night until I got downtown."

"Q. And then you mean to tell this Court and Jury, in spite of collecting three guns in that house that night that you didn't tell him you picked up a gun and took it to the Hughes' house?

"A. Absolutely, because I didn't think about it until I got back down. I had to call back and let them know. That's all I could do."

[9]Cross-examination of appellant:

"Q. I wish you could tell me why when the police officer asked you 'Did you handle or shoot a gun tonight' you said 'No.'

"A. They didn't ask me that. Only thing he asked me, 'Did you kill your husband?'"

188

Further, appellant denied that she made the alleged statement about moving the body of her husband. Counsel for appellant was also able to severely impeach the testimony of Officer Kuhin. First, there was testimony to the effect that once appellant went into the house after the police arrived she did not return to the driveway where her husband was lying as Officer Kuhin testified, but stayed in the house the entire time until taken downtown to the police station. When questioned about this, Detective McKibben, who was interviewing the appellant while she was in the home, stated that he could not recall whether the appellant ever left his presence and went back outside.

Second, Officer Kuhin testified that the statement "Ain't you moved that mother-fucker yet?" was made to him on November 24, 1974. Even though he did not make any report containing the statement, Officer Kuhin stated that he remembered the statement because it was an "unusual" one for a widow to make. In spite of the potential significance of such a statement Officer Kuhin did not tell *anyone* about it until March 11, 1975, the second day of the appellant's trial. Upon cross-examination Officer Kuhin said he didn't make the alleged statement known to his superior before that time, because he assumed they already knew of its existence, even though he made no report, and even though he testified on direct that no one else was present when the statement was made.

Third, Officer Kuhin testified that Mrs. Smith was "calm" in the face of her husband's death. Other witnesses testified that the opposite was true. Neighbor Ezel Vaughn testified that when appellant saw her husband in

---

°Officer Kuhin:

"Q. And how would you describe the grief she showed about her husband lying on the ground shot?

"A. From what I saw of her at that night, she seemed very calm. That's about the only way I could describe it.

"Q. Would you say she was restrained?

"A. Possible, yes."

Detective McKibben also characterized appellant's temperament as "calm."

the driveway under a flashlight when neighbors were present she "went berserk" and began "screaming, crying, and hollering." That same witness said that they "couldn't handle her" and that another neighbor had to grab her and take her into the house. Once in the house witness Vaughn testified that appellant was "emotional" when talking to the police and that she was crying periodically. Similar testimony was elicited from appellant's daughter, Rosa Thomas[10] and neighbors George Hughes,[11] Gertrude Hughes,[12] and Delores Foster.[13]

Fourth, appellant presented the testimony of numerous witnesses that she did not use the type of language attributed to her by Officer Kuhin.[14]

---

[10]Rosa Thomas:

"Q. Could you describe your mother's emotional condition at that time?

"A. Well, when I did get up she was very nervous and upset and was crying.

"Q. How could you tell she was nervous?

"A. She was shaking."

[11]State witness George Hughes, a neighbor of appellant, testified: "* * * the detective was questioning Mrs. Smith in the kitchen and she was quite shook up, so I was trying to console her while they were questioning her."

[12]Gertrude Hughes, neighbor:

"* * * I went over to tell her to come over, that Mrs. Smith was screaming and crying, carrying on so badly."

"A. No, she was out screaming and hollering out in the yard, and I asked her did she call the police, and she said, 'No.'"

[13]Delores Foster, neighbor:

"A. * * * [Mrs. Smith, appellant] was still crying, carrying on when the police came.

"Q. Do you remember anything she said?

"A. 'Oh my husband, oh my husband, Somebody done shot my husband.'"

[14]For example, Delores Foster:

"Q. Have you ever heard Mrs. Smith utter a swear word or cuss word?

"A. Pardon?

"Q. Did you ever hear her utter a swear word or cuss word?

"A. Never heard Maggie Smith utter a curse.

"Q. You never heard her say a curse word?

As discussed more fully in our treatment of appellant's first and second assignments of error, appellant also presented expert testimony to dispute the validity of the test conducted by Sergeant Kovacic.

The appellant also advanced her own theory of the cause of her husband's death. Testimony at trial established that the victim had played poker that evening with several other individuals. Also present was a Mr. "T" and two young males who accompanied him. Mr. "T" had previously been barred from playing in the game by the victim because Mr. "T" had been accused of cheating. But Mr. "T" was allowed to participate in the game on the evening of the murder. It was further established that the victim had won money in the poker gave and that Mr. "T" had been a loser. The appellant theorized that Mr. "T" was the man who she had heard arguing with her husband, and that he, or one of his two young companions, had shot her husband. Some corroboration for this theory was offered by the testimony of a neighbor that shortly after she heard the shots, she saw two young males in appellant's back yard.[15]

"A. I never even heard her use no profane language.

"Q. And that night, November 24, did she use a curse word?

"A. No."

Gertrude Hughes:

"Q. Have you ever heard Mrs. Smith speak a profane word?

"A. No, Mrs. Smith didn't curse.

"Q. She didn't curse?

"A. No."

[15]Delores Foster, appellant's neighbor, testified that:

"* * * I heard shots and then a few minutes later I heard a scream. I got up from my bed and went to the back window and looked out and I didn't see anything.

"Then I went back to the bedroom, then I heard the dogs barking. I looked out the side window and that's when I saw these two fellows in the back yard with a flashlight and they were shining it around on the grass.

"Then they picked up something and then they ran out."

"* * * There were two young boys and they had the flashlight and they were shining it around on the ground. Then whatever they picked up, they picked up something and they ran between the vacant lot."

Though appellant's counsel had provided the police department in the person of Detective McKibben with the names and addresses of many of those who had attended the card game that evening, including the address of Mr. "T",[16] Detective McKibben testified on the stand that he had not felt these matters important and had made no effort to investigate these leads.[17] Indeed, an examination of the record reveals that the police failed to conduct even the most minor of inquires—such as determining whether the blood upon the door seal of the house was of the same type as that of the victim, or checking the murder weapon or the knife found with appellant for fingerprints—and that once Mr. Kovacic's test showed a positive result for barium and lead on appellant's hands, the investigation was concluded.

With this evidence before it, the jury returned a verdict of guilty to the charge of murder. Appellant was sentenced to 15 years to life in the Ohio State Reformatory for Women. Upon appeal seven errors have been assigned.

I.

Appellant's first and second assignments of error are as follows:

The Court erred when it overruled appellant's motion to strike the testimony of the state's "Scientific Witness, Kovacic."

The Court erred in admitting into evidence testimony regarding the results of the "Gunshot Residue Tests."

Shortly after her arrest police officers had conducted a scientific test by which they hoped to determine whether or not appellant had fired a weapon that evening. That test

---

[16]This information was provided by defense counsel's letters to Detective McKibben dated December 10, 1974, December 16, 1974, and February 21, 1975. These letters were used in the cross-examination of Detective McKibben and admitted into evidence as Defendant's Exhibits C, D and E.

[17]Upon cross-examination Detective McKibben indicated that the fact that an hour and fifteen minutes had transpired between the end of the card game and the death of appellant's husband made the information concerning the names and addresses of those playing in the card game unimportant.

involved having the appellant place her hands on filter paper; spraying the filter paper with diluted hydrochloric acid and then again placing the filter paper on the backs of the hands. Subsequently, the filter paper is then sprayed with a reagent which "reacts" by changing colors if there are traces of lead and barium. The state contended that such a test was conducted; that the reaction occurred; and that the test results were consistent with the conclusion that appellant had fired a weapon on the evening in question.

The test administered to the appellant was one developed independently by Sgt. Kovacic. It had as its basis the Harrison-Gilroy Gunpowder Residue Test. Though at trial Sgt. Kovacic was somewhat familiar with the Harrison-Gilroy test, he did not recall its proper name; did not recall the step-by-step procedures as set forth by its originators; and testified that he did not have any manual in his office which he could consult to determine what procedures should actually be used in administering the test. Nevertheless, Sgt. Kovacic testified that he used the Harrison-Gilroy test, after making two major modifications.

First, unlike Harrison-Gilroy which tested for three elements—lead, antimony and barium—in order to determine that a weapon had been fired, Sgt. Kovacic's test considered only the presence of lead and barium. Second, while the Harrison-Gilroy test requires swabbing the areas of the hand with a tenth normal hydrochloric acide solution and cotton swabs, Sgt. Kovacic sprayed the diluted acid onto filter paper and then placed the filter paper on appellant's hands. This takes on added significance because appellant's expert witness testified that some filter paper contains some of the elements the test is designed to detect.

These modifications were made because Sgt. Kovacic considered them to be logical improvements. While independent studies have been made to evaluate the reliability of the Harrison-Gilroy test, there is no evidence in the record before us that anyone, including Sgt. Kovacic, has ever conducted any experiments to attempt to objectively determine whether Sgt. Kovacic's test was or was not reliable.

In order to present evidence of the results of a scientific test such as the one at bar, the party offering such evidence must establish that:

(1) The test was based upon scientific principles which are accepted as dependable for the proposed purpose by the profession concerned in that branch of science or its related art and has "gained general acceptance in the particular field into which it belongs." *E. Cleveland* v. *Ferell* (1958), 168 Ohio St. 298, 301; *Columbus* v. *Marks* (1963), 118 Ohio App. 359, 361; *Tiffin* v. *Whitmer* (1970), 32 Ohio Misc. 169; *Frye* v. *United States* (D. C. 1923), 293 F. 1013, 1014; *People* v. *Alston* (1974), 362 N. Y. S. 2d 356.

(2) The apparatus and/or materials used to make the scientific test were constructed or produced according to an acceptable model and be in such a condition as to allow for accurate experimentation. *See, E. Cleveland* v. *Ferell, supra; Columbus* v. *Marks, supra; Tiffin* v. *Whitmer, supra.*

(3) The witness who conducted the test must be qualified to conduct the test by his training and experience. *See, E. Cleveland* v. *Ferrell, supra; Columbus* v. *Marks, supra; Tiffin* v. *Whitmer, supra.*

In the case at bar the state failed to meet its burden of proof on the first element set forth above. Based upon his thirteen years of experience with the Scientific Investigation Unit and his membership in various scientific associations, we believe it is clear that Sgt. Kovacic was properly qualified to conduct tests such as the Harrison-Gilroy test or his own gunshot residue test as outlined above. However, an expert can testify as an expert witness only in his field of expertise.

There is absolutely no evidence in the record from which it can be concluded that Sgt. Kovacic was qualified either to testify as to the theoretical basis of a new test for determining the presence of gunshot residue or to give expert testimony that such a test was generally accepted in the scientific community. It must be remembered that both the Harrison-Gilroy and the Kovacic tests are based upon principles of chemistry. This is not a situation, such as voice print analysis, *cf., People* v. *Kelly* (Cal. 1976), 19

Cr. L. 2233, *with United States* v. *Baller* (4th Cir. 1975), 519 F. 2d 463, where the "field" of inquiry is limited to law enforcement officers. Rather, there are a large number of individuals with the requisite background in chemistry to conduct adequate scientific experiments designed to ascertain the validity, if any, of the Kovacic test.

Under these circumstances we find that the results of the test conducted by Sgt. Kovacic should have been excluded upon the following grounds:

(1) There was no competent testimony that the Harrison-Gilroy test, as modified by Sgt. Kovacic, was based upon sound scientific principles;

(2) There was no evidence that the test had been proved dependable by controlled tests; and

(3) There was no testimony that Sgt. Kovacic's modified version of the Harrison-Gilroy tests was known, much less accepted, by anyone in the scientific field of chemistry.

Accordingly, we find merit in this assignment of error and reverse and remand for further proceedings according to law.

II.

Appellant's third assignment of error is as follows:

The Court erred when it denied Defendant's request for an in camera inspection of the written report of a state witness who had refreshed his memory from the report before taking the stand to testify.

At trial appellant took the stand in her own behalf. Upon direct examination she testified that after discovering the body of her husband, she picked up the gun which caused his death and which was lying near the bumper of the car in the driveway. In rebuttal the state offered the testimony of Detective Eugene Volk that appellant had told him that she found the gun on the kitchen floor. Upon cross-examination Detective Volk indicated that he had prepared a police report that contained his recollection of the conversation between himself and the appellant and that he, prior to testifying, used that report to refresh his memory. Upon cross-examination, appellant moved for an in camera inspection of the police report to determine

whether there were any inconsistencies between the detective's testimony at trial and the facts as he recorded them in his report.

In considering whether such an inspection should be conducted the trial court indicated that it was a "close question," but concluded that even though the report appeared to contain "contrary" statements, it was not subject to discovery under Criminal Rule 16.[18]

Criminal Rule 16(B)(1)(g) provides:

"In camera inspection of witness' statement. Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.

"If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies.

"If the court determines that inconsistencies do not exist the statement shall not be given to the defense attor-

---

[18]After much discussion, the trial court ruled as follows:

"The Court: Well gentlemen, I can't give it any more time than I have given it.

"From my inspection of the incident, it seems to be contrary, but I am not going to pass on it for counsel for the defense on it.

"My tendency is to rule it is not admissible, but I think that there might be some danger in that ruling because the Courts have noted so far as information not subject to discovery under Rule 16, such as under Section B1:B, D, H & G.

"Now, this rule does not authorize discovery for the memoranda or other internal documents made by the prosecuting attorney, by his agent, or the prosecution in the case, or the statements made by a witness or directed a witness to state against the Grand Jury transcript—and so on and so on.

"All right, my ruling is that it is not subject to discovery in the case."

It should be noted that, because there were no inconsistencies, the state had previously acceded to an inspection of Detective McKibben's report.

ney and he shall not be permitted to cross-examination or comment thereon. \* \* \*'

And Criminal Rule 16(B)(2) reads as follows:

"Information not subject to disclosure. *Except as provided in subsections (B)(1)* (a), (b), (d), (f) and *(g)*, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents." (Emphasis added.)

When these portions of Criminal Rule 16 are read together they make it clear that in camera "inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents [*i. e.*, the police] in connection with the investigation or prosecution of the case" *is mandated* when the person who prepared such report, memorandum or document takes the stand as a witness in a criminal proceeding to testify about the events of which he claims to have personal knowledge and which he recorded in that document.

Consequently, it is my opinion, in contrast to the reasoning of my two colleagues in the concurring opinions herein, that the trial court erred when it ruled that the police report used to refresh the memory of the state's witness was privileged from in camera inspection because it was an internal police report, and find merit in this assignment of error.

### III.

Appellant's fourth assignment of error is as follows:

The Court erred when it allowed three pistols, unrelated to the crime, to go to the jury.

The state, in its case in chief, presented testimony which, if believed by the jury, would establish that the appellant showed the police the location of three weapons kept in her home, but failed to explain to the jury that a short time before the appellant had taken a fourth weapon —the murder weapon—to her neighbor's home. This was evidence from which the jury could conclude that appel-

lant was volunteering information concerning guns which were not material to the investigation of her husband's murder, and concealing material information in the form of the location of the murder weapon. If such a finding of fact was made by the jury, it could use it to infer that the appellant's conduct was evidence of guilt.

In the course of introducing such testimony, the state introduced into evidence each of the four weapons. As we recognized in *State* v. *Roger Scott* (Cuyahoga Cty. Ct. App. Nov. 20, 1975), No. 33484, at 8, evidence, though relevant, should be excluded when its probative value is substantially outweighed by the risk that its admission will cause undue or unfair prejudice. Without intending to deny that the introduction of the guns themselves add to any significant degree to the probative value of the testimony of the state's witnesses, we nevertheless find that the trial court did not abuse its discretion in its decision to admit the weapons into evidence. [19]

Accordingly, this assignment of error is hereby overruled.

## IV.

Appellant's fifth assignment of error is as follows:

The Court erred in refusing to allow evidence of the positive result of the appellant's polygraph examination to be presented to the jury.

It is well established in Ohio that the results of a polygraph test are not admissible to attempt to prove the guilt or innocence of a defendant in a criminal proceeding. *E. g.,* *State* v. *Jarosy* (1973), 39 Ohio App. 2d 35; *State* v. *Hegel* (1964), 9 Ohio App. 2d 12; *State* v. *Hill* (1963), 40 Ohio App. 2d 16; *State* v. *Smith* (1960), 178 N. E. 2d 605. *See, State* v. *Jaroszyk* (1973), 39 Ohio Misc. 19 and the cases collected and analyzed therein. *See also Parker* v. *Friendt* (1954), 118 N. E. 2d 216. *Cf. State* v. *Towns* (1973);

---

[19] In so holding we reject the prosecutor's argument that the fact that the victim owned three weapons and had given a fourth to his wife tends to establish a lack of "peacefulness" and thereby is a relevant factor to be considered in weighing appellant's guilt or innocence.

35 Ohio App. 2d 237. Our examination of the record and the briefs of the parties fails to reveal any new theory of law or advancement in the reliability of the polygraph which would cause us to conclude that the trial court committed prejudicial error in excluding the results of the polygraph. Accordingly, we overrule this assignment of error.

## V.

Appellant's sixth assignment of error is as follows:

The Court erred when it misstated testimony.

Upon direct examination Sharon Rosenberg, an expert witness called by the state, testified that she had conducted various tests upon the hands of the decedent and that the results were negative. When asked to explain the significance of such negative results, Ms. Rosenberg replied as follows: "On the basis of this test I have no indication that the person did fire a gun recently." Thus, the testimony of Ms. Rosenberg concerned what the tests did *not* prove. There was absolutely no testimony in the transcript by which it could be said that Ms. Rosenberg gave an opinion that the failure of the tests to establish that the decedent had fired a weapon indicated that he had not, in fact, fired such a weapon. In effect, the testimony of Ms. Rosenberg leads one to the conclusion that such tests can prove that a weapon was fired, but that they cannot establish that weapons were not fired. We are not suggesting that under the proper conditions an expert could not testify as to his opinion as to whether an individual had fired a gun based upon such negative results. We are simply noting that the record in the case at bar contains no such testimony.

The state made much of these negative findings, and used them to argue to the jury that the victim had not used a weapon that evening and asked the jury to use that conclusion as circumstantial evidence in support of the state's theory that appellant had the victim's gun in her possession immediately prior to his death. In its instructions to the jury the trial court misstated the testimony of Ms. Rosenberg in the following manner: "In her opinion, he [the victim] had not fired a gun recently." It is evident

that in instances such as this, such a misstatement may rise to the level of prejudicial error. *Wuest v. Baltimore & Ohio* (1905), 5 Ohio C. C. (N. S.) 619. *See generally, Haase v. Ryan* (1955), 100 Ohio App. 285; *Heyman v. City of Bellevue* (1951), 91 Ohio App. 321. But in the case at bar there was no objection at the time the court made the error, nor at the end of the charge. Having thus failed to bring the matter to the court's attention, appellant has not properly preserved the matter for appeal.

Accordingly, we overrule this assignment of error.

Appellant assigns as her seventh assignment of error that:

The defendant suffered prejudice from the misconduct and improper argument of the prosecutor in final argument.

The record discloses a statement made by the prosecutor during final argument to the effect that guns were left "laying all over the house" and that the "loaded gun" was the "damnation of our society." It is well settled as a principle of law that such comments extend to matters outside the record in the case at bar and tend to influence the jury to make a decision based upon matters other than evidence constituting proof of guilt beyond a reasonable doubt. As such, the prosecutor's comment was erroneous. *State v. Agner* (1972), 30 Ohio App. 2d 96; *State v. Cloud* (1960), 112 Ohio App. 208.

We further note that this single comment was not so significant during the trial to cause counsel for appellant to object or to ask the court for curative instructions. Upon examination of the prosecutor's entire closing argument we conclude that the error was harmless.

Having found merit in the first, second and third assignments of error advanced by appellant, we reverse and remand for further proceedings according to law.

*Judgment reversed.*

PARRINO and DONOFRIO, JJ., concur.

DONOFRIO, J., of the Seventh Appellate District, sitting by designation in the Eighth Appellate District.

PARRINO, J., concurring. As to the third assignment of error, however, I concur in judgment only for these reasons. In this case Detective Eugene Volk testified as a prosecution rebuttal witness concerning an oral statement which appellant had made to him. The officer recorded the statement in an official police report. He testified that he had reviewed the report before taking the witness stand. He did not use the report while testifying.

Since this officer used the police report to refresh his recollection, appellant, in her third assignment of error, claims that the trial judge erred in refusing to conduct an in camera inspection of the report after Volk testified on direct examination to determine the existence of inconsistencies between the report and his testimony.

Although the language of appellant's third assignment of error[20] is directed to the trial judge's failure to conduct the requested in camera inspection of the report used by the witness to refresh his recollection, appellant, to support this assignment of error, also argues she had the right to have such inspection for the additional reason she had filed a timely pre-trial discovery motion pursuant to Criminal Rule 16(B)(1)(a)(ii).[21] In that motion she sought to inspect the written summaries of all oral statements made by appellant to the prosecutor or any law enforcement officer. She did not receive them.

The transcript of proceedings indicates that appellant,

---

[20]"The Court erred when it denied Defendant's request for an in camera inspection of the written report of a state witness who had refreshed his memory from the report before taking the stand to testify."

[21]"(1) Information subject to disclosure

"(a) Statement of defendant or co-defendant. Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which are available to, or within the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney * * *.

"(ii) Written summaries of any oral statement, or copies thereof, made by the defendant or co-defendant to a prosecuting attorney or any law enforcement officer * * *."

in requesting an in camera inspection of Volk's report, was doing so for the following reasons:

1. The witness had used the report to refresh his recollection.

2. Appellant was entitled to inspect the report as a matter of right under Criminal Rule 16(B)(1)(a)(ii).

The motion was overruled.

In the trial of a criminal case an accused's counsel is not entitled to inspect a written police report where an officer does not use the report while testifying notwithstanding the fact that he has read it to refresh his recollection prior to taking the witness stand. *State v. Strain* (1948), 84 Ohio App. 229; *State v. Taylor* (1947), 83 Ohio App. 76.

Notations made in official police reports are a part of the prosecution's internal work product and as such are not, subject to disclosure in a judicial proceeding. *Kott v. Perini* (1968), 15 Ohio Misc. 309.

For these reasons the trial judge was correct in denying appellant's motion for an in camera inspection of the police report merely because Detective Volk had used it to refresh his recollection.

However, consideration of appellant's second argument requires further analysis. Rule 16 of the Ohio Rules of Criminal Procedure has provided expanded discovery in criminal judicial proceedings. Upon motion duly made Criminal Rule 16(B)(1)(a)(ii) provides that the prosecuting attorney must permit inspection of the written summaries of oral statements made by a defendant to a prosecutor or law enforcement officer. A motion seeking such discovery was made by the defendant in this case.

Criminal Rule 16(B)(2), however, specifies information possessed by the prosecutor which is not subject to disclosure.[22] Clearly this provision does not authorize or re-

___

[22] "Information not subject to disclosure. *Except as provided in subsections. (B)(1)(a), (b), (d), (f) and (g)*, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of state-

quire the disclosure of internal documents made by the prosecuting attorney or state agents in connection with the prosecution or investigation of a case except as otherwise specifically provided in the rule itself. In my view there is nothing contained in Criminal Rule 16(B)(1)(g)[23] which requires the court to conduct an in camera inspection of material which is not subject to disclosure under Criminal Rule 16(B)(2).

Criminal Rule 16(B)(1)(g) which requires an in camera inspection of witness' statements by a trial judge is substantially the same as prior Ohio practice enunciated in the case of *State* v. *White* (1968), 15 Ohio St. 2d 146. This rule requires the trial judge to conduct an in camera inspection of a state witness' prior written or recorded statement upon completion of his direct examination to determine the existence of inconsistencies between his testimony and the statement. Criminal Rule 16(B)(1)(g) is not applicable to reports, memoranda or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of a case. Criminal Rule 16(B)(2).

However, where a defendant, pursuant to Criminal Rule 16(B)(1)(a)(ii), has filed a motion for discovery requesting inspection of the written summaries of oral statements made by him to a prosecutor or police officer, the prosecut-

---

ments made by witnesses or prospective witnesses to state agents." (Emphasis added.)

[23]"In camera inspection of witness' statement. Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.

"If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies.

"If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examination or comment thereon. * * *"

ing attorney has a duty to permit such inspection without delay. The failure to do so may have an adverse effect upon a defendant's defense. For example, it may influence his decision in making a plea or in deciding whether or not to take the witness stand in the event of trial. It would be grossly unfair if the defendant were led to believe that no such statement exists and thereafter be confronted with one during trial. It is this type of situation which the criminal rules were expressly designed to prevent. When a defendant possesses this information he then has the ability to make a knowing and intelligent decision as to his course of conduct before and during trial.

Under the provision of Criminal Rule 16(D)[24] the prosecuting attorney, immediately upon its discovery, had the duty to permit defense counsel to inspect the written summary of defendant's oral statement contained in Detective Volk's written police report. Absent such inspection, the trial judge, to insure the defendant a fair trial, also had the duty to order the inspection of Detective Volk's report or at a minimum to conduct an in camera inspection of that report.

Since the defendant was not permitted to inspect the report and since the trial judge failed to conduct an in camera inspection thereof to determine the existence of inconsistencies between the report and the witness' testimony, appellant's third assignment of error is well taken.

DONOFRIO, J., concurring. As to the third assignment of error I also concur in judgment only for the reasons stated by Judge Parrino.

---

[24]"(D) Continuing duty to disclose

"If, subsequent to compliance with a request or order pursuant to this rule, and prior to or during trial, a party discovers additional matter which would have been subject to discovery or inspection under the original request or order, he shall promptly make such matter available for discovery or inspection, or notify the other party or his attorney or the court of the existence of the additional matter, in order to allow the court to modify its previous order, or to allow the other party to make an appropriate request for additional discovery or inspection."