**STATE of Missouri, Plaintiff-Respondent,**

v.

**Jerry Lynn STOUT, Defendant-Appellant.**

**No. 56070.**

Supreme Court of Missouri,
Division No. 2.

March 13, 1972.

Motion for Rehearing or to Transfer to
Court En Banc Denied
April 10, 1972.

John C. Danforth, Atty. Gen., Glen A. Glass, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Van Matre & Van Matre, Mexico, Mo., for defendant-appellant.

DONNELLY, Judge.

Appellant, Jerry Lynn Stout, was convicted of murder in the second degree by a jury in the Circuit Court of Cass County, Missouri, and his punishment was assessed at a term of thirty-five years imprisonment. Following rendition of judgment and imposition of sentence an appeal was perfected to this Court.

In the early morning of July 17, 1968, an intruder entered the apartment of Gary Frieders and his wife, Judy, and beat them with a blunt instrument as they lay sleeping. Judy Frieders died on September 16, 1968, of injuries received from the beating.

During the investigation of the crime, Professor George Leddicotte, an analytical chemist, used the nuclear reactor facility at the University of Missouri at Columbia to compare, by the process of *neutron activation analysis*, the blood-stained floor mat of appellant's car, appellant's blood-stained tee shirt, the Frieders' blood-stained sheet, and a whole blood sample of Judy Frieders. As a result of his analysis, he testified:

"A That is right. I saw, with the greatest degree of scientific certainty, that there was a match of the materials; that is, * * * [the blood on the tee shirt and the sheet] come from a common article.

\*   \*   \*   \*   \*   \*

Q Did you form an opinion to the highest scientific certainty as to whether the spot that you found on the floor mat had a common source of origin with that that you found—

A I did.

\*   \*   \*   \*   \*   \*

Q And what is that opinion?

A That * * * [the blood on the floor mat and sheet] were of common origin.

* * * * * *

Q Did you compare * * * [the whole blood] with your tests on the sheet, and your tests of the tee shirt? A That's right.

Q And I will ask you what the results of that test were?

* * * * * *

A I considered, with my scientific knowledge, that they are the same.

* * * * * *

Q So, the blood that you found on * * * [the tee shirt], is the blood of Judy Frieders? A Yes."

The determinative question on this appeal is whether this testimony, elicited from Leddicotte, and presented to the jury, was legally admissible.

In Frye v. United States, 54 App.D.C. 46, 293 F. 1013, 1014 (1923), the Court of Appeals of the District of Columbia said: "* * * Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

In State v. Stevens, Mo.Sup., 467 S.W.2d 10, 22–24 (1971), this Court discussed the process of neutron activation analysis and affirmed a conviction involving its use to identify samples of *hair*. The question presented in this case is whether the application of neutron activation analysis to *blood* samples meets the *Frye* test.

The parties agree that blood samples present a unique challenge to identification by neutron activation analysis primarily because of the large amounts of sodium and chlorine in blood. Out of the hearing of the jury, Professor Leddicotte testified as to the application of neutron activation analysis to blood samples:

"Q When you say you are the only authority on the subject on blood right now, what do you mean?

A I consider myself an authority at this point on the technique that I have—the activation analysis technique that I have employed in the analysis of blood.

Q You said, 'On blood, right now I am the only authority;' that was your answer; is that right?

A On blood as it's related to forensic science.

* * * * * *

MR. ESSER:

Judge, I think that he's testified that analytical chemistry is the field which he is talking about. Neutron activation analysis is a particular principle involved. Because of that, he has testified it has gained wide acceptance, is utterly accepted as a method or principle in the area of analytical chemistry. I think that's the—

MR. WILLIAM VAN MATRE:

He's the only one that can do it in the world.

THE COURT:

Objection overruled. Proceed with the blood aspect of it; make a record. You may proceed.

A Well, blood—blood is composed of—of many different components, and I will just list a number of them. (Witness writing on black board)

"A I could go down the Periodic Table and say blood contains something like

92 element species—isotopes for 92 different elements. The major species that we find generally in blood, are these three here. (Indicating). When we say the major species, we are talking about these species that are in concentrations in the order of one tenth percent or more. Anything below one tenth percent, as far as most of the applications of the activation analyses are concerned, are generally related to trace analysis. The point that I am trying to get at, at this time, is that I am looking for these species that are in samples of blood that are trace elements; less than one tenth per cent. If I go ahead and make an activation, I bring my sample—I am digressing for the moment, just to get down to characteristics here. I bring into composition—After the activation is completed, I bring my sample to a radiation detector, and measurement system. In principle, since I have gamma radiation, I do have beta radiation, but I ignore the beta, because my radiation detector measurement system is based principally on the interaction of the gamma rays with the detector and when the gamma rays interact with the detector, and in general—Let me try to give you a very rough idea of what a detector for much of this does. This happens to be what we normally refer to as a sodium iodide crystal. My sample comes into the detector like this. The radiations that are being given off here, will interact with the sodium iodide atoms. In this instance, remember this is unstable sodium compared to the radio active sodium. It will cause a series of light flashes, again radiation, imparting energy to the atoms, and in turn, this energy is now radiated, or light flashes. The—These light flashes pass into what we refer to as a multiplier photo tube; these energy bursts can be picked up and timed as a series of flashes in this full photomultiplier tube, and this information is fed to, which I will just call for the moment, a pulse height analyzer. All this is nothing more than a big electronic box which has a ferrite memory core which is compared to the group of brain cells that we have. In other words, it's a mechanical brain to the extent of being able to accept these bursts of electrical energy now and sort them out into the respective —or the—the reciprocal of the gamma ray energy that brought about the interraction first. As a result, they have been bent in these particular areas of the memory core, and they can be called out then by another electronic device, which is just a read-up mechanism; and we call this out, then, in most instances, a X-Y Recorder, that we generally refer to as a gamma ray spectrum. Now, if I look at a sample of blood under the conditions that the honorable gentleman over here is getting at, trying to get me to say that I am new at it, I'm—I am trying to get to the point of saying if I looked at a sample that is not shielded, then I will get a spectrum—gamma ray spectrum that will look very much like this. Now, this one is Sodium Gamma; these are the Chlorine 38 gammas, and this is the other Sodium 24 gamma. Now, if I have materials—other radioactives—and as I said to you before, any time that I get to the activation of a sample material, whether it's blood or water, anything at all—

MR. ESSER:

Does this graph purport what it would be if you do not use a cadmium shield?

A   That's right. This is a unshielded sample. What it says is that anything I see down underneath this—not see —know that should be down underneath this is going to be hid by these energies—or gamma energies from

Sodium and Chlorine. As a result, if I take and apply a technique, which we call cadmium shielding; that is, place my sample in a thickness of cadmium metal, and cadmium metal is used in this case to filter out all thermalized neutrons, being of course, the point 026 point. As a result, neutrons filter out those entirely, and then I will have the ability of seeing specimens that will have—These are, of course—would have to be looked at a little bit more than by rough sketch.

BY MR. ESSER:

Q Professor Ledicotte, what you are before, is the graph and process used without the cadmium shield. Is that generally accepted as a method for neutron activation analysis?

A No. In blood samples; no.

MR. EVERETT VAN MATRE:

There's the answer, Your Honor.

THE COURT:

Well, what did you finally end up doing?

A I finally ended up covering all samples with a cadmium shield so that I could undertake to unravel the interferences; they are the interferences from Sodium and Chlorine that appear in blood. I minimize the amount of—

THE REPORTER:

I didn't understand you.

A I—As I say, Sodium and Chlorine are interferences, and I minimize their interference by placing the cadmium shield in and about my sample, so

that I now get not the activation of the Sodium 23, or the Chlorine 38 atoms here, but I get the activation of all other atoms, of all elemental species within the blood specimen.

BY MR. ESSER:

Q When I asked you that question, what I was asking, are either of these processes, widely accepted in the neutron activation process of blood, one of the—

A No, they are not; uh uh, they are not. They didn't—They—They—They recognize the limitations on this; and therefore, the ability to shield that interference is out; then, we, of course, come to this. Now, the only thing that we can do it by, blood analysis, besides this, is to actually process a—blood by a chemical procedure. This means, of course, going through a series of chemical separations to find these other species here; but in forensic work, we endeavor to approach it from a nondestructive analysis so that at least the physical evidence is secured in the extent that it has not been destroyed during the assay."

The parties agree that neutron activation analysis is generally accepted as a "scientific technique of chemical analysis." The State argues that this is enough to meet the *Frye* test. We do not agree. The issue must be narrowed to whether the application of the "Leddicotte technique" to blood samples has "gained general acceptance in the particular field in which it belongs." In this case, on the record presented, we conclude it has not. Cf. People v. King, 266 Cal.App.2d 437, 72 Cal.Rptr. 478 (1968); State v. Cary, 99 N.J.Super. 323, 239 A.2d 680 (1968). "It may well be, of course, that some day in the near or distant future the * * * [Leddicotte technique] will achieve the same degree of acceptance as the present standard blood

tests. In that event the courts will welcome * * * [its] use as an aid in our never-ending pursuit of truth. But until that day comes we must continue to * * * [pro-tect] both litigants and jurors against the misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature." Huntingdon v. Crowley, 64 Cal.2d 647, 51 Cal.Rptr. 254, 262, 414 P.2d 382, 390 (1966).

It is interesting to note that in 1969 the Supreme Court of New Hampshire, in State v. Coolidge, 109 N.H. 403, 260 A.2d 547, held that its trial court correctly excluded neutron activation analysis results on hair. Subsequent to that case, extensive testing on neutron activation analysis of hair was done. By 1971, neutron activation analysis of hair had become generally accepted in the scientific community, as reflected in State v. Stevens, *supra*. Presently the "Leddicotte technique" occupies a position as to blood similar to that occupied as to hair when the New Hampshire Supreme Court decided State v. Coolidge, *supra*. If, through future testing, the "Leddicotte technique" as to blood gains general acceptance, re-examination of the position taken today will be in order. Until such acceptance, we must hold the trial court erred.

Appellant also urges "that if the illegal testimony of George Leddicotte had not been admitted into evidence, there would not have been a submissible case against the defendant, and his motions for acquittal should have been sustained." (Cf. State v. Harris, 324 Mo. 223, 22 S.W.2d 802). We do not decide this issue on this appeal. In any event, the cause should be remanded for a new trial. State v. Patton, Mo. Sup., 308 S.W.2d 641.

The judgment is reversed and the cause remanded.

All of the Judges concur.